IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BRANDON WASHINGTON<br>    Plaintiff, | : : : | |
| vs. | : : | CIVIL ACTION 17-0095-KD-MU |
| JEFFERSON DUNN, *et al.*,<br>    Defendants. | : : : | |

Plaintiff Brandon Washington, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983. This matter is before the Court on Defendants Wall and Langford's motion for summary judgment (Docs 41, 42)[1]. Summary judgment is **GRANTED** in favor of Defendants Wall, Langford as to all claims asserted against them.[2]

## I. Summary of Factual Allegations.[3]

### a. Complaint.

Plaintiff Washington alleges that members of the Alabama Department of Corrections Emergency Response Team ("CERT Team") used excessive force against him on November 9, 2016, when the CERT Team entered B-Dorm (or Bravo Unit) at

---

[1] The Special Reports were converted into summary judgment motions on November, 8, 2019. Washington did not respond to the motions for summary judgment.
[2] **The remaining defendants' motion for summary judgment will be addressed in a separate order.**
[3] The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riveria Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000).

approximately 6:30 a.m., and immediately began harassing and assaulting inmates.[4]

(Doc. 1 at 5).  In his complaint, Washington specifically alleges:

> I was laying in bed asleep.  I was awoken by loud noises and screaming. When I raised from my bed, all I saw were C.E.R.T. officers running into the dorm with shields, masks over their face, guns and sticks in their hand banging against the concrete screaming "It's C.e.r.t. motherfuckers, lay on your stomach"!! . . . [For approximately 10 seconds] I watched members viciously hit and beat inmates with sticks screaming "Lay on your stomach!!" . . . As the CERT members made their way closer to me, I begin to turn over on my stomach, in the hopes that I don't get hit or beat. I turned my head away from the board on my bed, so I could face the main aisle and continue to see what's going.  Unfortunately, that was a mistake because I was hit with the butt end of a stick anyway and told to cross my legs, turn my head and put my hands behind my back.  I writhe in pain from the blow that hit me directly in the middle of my back on my spine.  I complied with every instruction and I could feel plastic restraints being placed upon my wrists. . . . The screams of the inmates began to recede as the CERT members had placed the entire dorm in plastic restraints atop their bed. Then CERT began to call out names of inmates, supposedly looking for certain individuals.  As they called out names and bed numbers, the screams of pain began to arise again. . . .I heard my name called and I quickly laid my head back down.  They called my name multiple times but I didn't answer for fear of getting beat.  That's when I heard a CERT member say "Here he is, I found Washington!" . . . That's when a CERT member screamed "Turn around motherfucker", and then it happened.  The sticks began to crash and slam into my body.  Pain erupted from my ribs, spine, legs and my ribs knocked so much air outta my lungs that I couldn't scream if I wanted. . . .[Officer Pacheco then dumped a cooler of] ice cold water on me. . . . I was surprised with another blow right beneath my armpit that made me forget all the other pain in my body and made me bite my tongue.  I was snatched up off my bed, stood up and hit again in my spine and told to walk forward towards the front. . . . Suddenly I was kicked in the back and fell forward only to fall on top of the other inmates. I laid there trying to find a comfortable position atop the bodies only to be kicked in the mouth by a CERT member and told to be still. . . . I watched and listened as the officers walked around and screamed out insults like "fuck niggers" and "I wish I could piss on you motherfuckers". . . .[An officer stood] on my face and head, walkin back and forth as if I was the concrete itself. . . . One by one

---

[4] Washington claims the CERT Team made "statements like: 'Where the GD's, Crips and Bloods at now', 'Aryan Brotherhood and Nations where yall at', 'on C.E.R.T. We will beat your Ass', Yall Bitches and Fuck Niggers stood up the other day Standup now' . . . 'Yall stabbed Warden Davenport and Killed Officer Bettis, pull something out now on C.E.R.T. we will beat your Ass.'"  (Doc. 1 at 5-6).

2

>we were taken to the infirmary where the nurse looked at my face asked for my name and sent me back.  One of the older guys on the CERT Team knew me and told me to go back to my bed because he said I was never a problem.  My hands still in restraints I walked to my Bed and sat down.  I was there for a bout 30 seconds when an officer by the name of Nathan McQuirter came to me slapped me and took me back up front. . . . minutes later myself and about 20 other inmates were herded together and taken to solitary confinement. . . . For 2 months I dealt with extreme pain primary in my ribs which made every breath excruciating!! No medical treatment was given nor did a nurse do a body chart prior to me coming back here.  Even now I deal with occasional rib and back pain that I've never had before.

(Doc. 1 at 6).  In his complaint, Washington further alleges that on Nov. 9, after he was placed in the segregation unit, he used a cell phone to take photographs of himself.  (Doc. 1 at 6).  These photographs and accompanying text messages have been submitted as part of Defendants' Special Report.  (Doc. 26-22 at 1-6).  While the black and white photographs are grainy, unclear copies and difficult to discern, they appear to capture the segregation cell in which Washington was placed, the inside, left of his tongue (apparently where he bit it), a bruise underneath his arm where he alleges he was hit, and an abrasion and bruises corresponding to his allegations  (Id.).  Furthermore, the texts include the following messages:

>"They broke my ribs"
>"My whole body hurts..I probably have marks all over my back"
>"They just. [C]ame in and pulled out a few of us that they considered leaders and beat us."
>"I was still asleep"
>"I have no clothes or anything"
>"No jus my boxers..tank top and socks"
>"I think my rib broke"
>"No babe but I know it's at [l]east cracked"

(Id.).

Plaintiff contends that the force used on November 9, 2016 was precipitated by a prior incident that occurred on November 7, 2016.[5] According to Washington, on November 7, 2016, members of the CERT Team, as well as other correctional officers, entered B-Dorm to conduct an institutional count of the inmates. (Doc. 1 at 5). On that date, inmates had placed "makeshift tents" on their beds to "gain some space from the inmate he shares the 5'x 6' living area with", and officers ordered inmates to remove the tents. (Id.). Washington claims while the inmates removed the tents, one of the CERT Team members "aggressively" broke a stick from inmate Quandarian Falkner's bed which "resulted in a reaction from the C.E.R.T. Members, Correctional Officers present and the Inmates, after a brief stillness, the count was conducted and the C.E.R.T. TEAM Members and Count Team exited the dorm." (Id.).

Plaintiff Washington is suing Alabama Department of Corrections Commissioner Jefferson Dunn, Associate Commissioner Grantt Culliver, Warden Cynthia Stewart, Warden Terry Raybon, Warden Phillip Mitchell, Captain Darryl Fails, Lieutenant Ashley Kidd, Officer Gary Scarborough, Officer Timothy Vignolo, members of the Alabama Department of Corrections Emergency Response Team ("CERT Team") who participated in the contraband search in Holman Correctional Facility's B-Dorm on November 9, 2016, and Nurses Wall and Langford.[6] Washington seeks compensatory and punitive damages

---

[5] Reference to the November 7, 2016, and November 9, 2016, incidents subject of this report may hereinafter be referred to as the Nov. 7 and Nov. 9 incident, respectively.
[6] Washington originally named as defendants in this action, Alabama Department of Corrections Emergency Response Team, Nurse 1, Nurse 2, Nurse 3, Nurse 4, and Cubicle Officer assigned to Cubicle 1. (Doc. 1 at 17-18). "As a general matter, fictitious-party pleading is not permitted in federal court." Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010); see also CSX Transp., Inc. v. United Transp. Union, 236 F. App'x 562, 563 n.1 (11th Cir. 2007) ("the Federal Rules do not authorize suit against fictitious parties"), cert. denied, 552 U.S. 1243, 128 S. Ct. 1475, 170 L. Ed. 2d 297 (2008);

4

against each defendant in the amount of $200,000.00, declaratory and injunctive relief, trial by jury, "State Law claims of Assault & Battery; Slander; Harassment and such other relief as the law and this Court Deem Just." (Doc. 1 at 12).

    **b. Defendants' Answers and Special Reports.**

Defendants have answered the suit denying the allegations against them and filed special reports in support of their positions. As part of their special reports, Defendants have submitted pertinent prison documents, including the November 9, 2016 Incident Report, Use of Force Report, I&I Investigative Report, disciplinary records, medical records, and defendant officers' affidavits.

Defendants contend that Washington was "combative and refused to comply with the orders given by the CERT team" on Nov. 9 and force was used on Washington for the purpose of gaining control of Washington. (Doc. 26 at 5). Washington received a medical evaluation after the use of force incident and was reassigned to segregation. Washington's medical evaluation indicated sore ribs and a 2 cm abrasion to his left rib area. Washington received a disciplinary charge for gathering in a threatening or intimidating manner and unauthorized possession of a weapon. Washington was found not guilty of the charges due to a procedural violation.

---

Featherstone v. Home Oil Co., 2011 U.S. Dist. LEXIS 139102, 2011 WL 5978774, at *1 n.4 (S.D. Ala. Nov. 8, 2011) (subject to a limited exception, "fictitious party practice is not permitted in federal court"). The limited exception to this rule is when the plaintiff's description of the defendant is so specific as to be "at the very worst, surplusage." Dean v. Barber, 951 F.2d 1210, 1215-16 (11th Cir. 1992).
    In the instant case, Washington's attempt to file suit against "Alabama Department of Corrections Emergency Response Team", "Cubicle Officer", "Nurse 1", "Nurse 2", "Nurse 3", and "Nurse 4" fails, as these are inadequate descriptions to identify the necessary persons. These unnamed persons are incapable of being served and are not defendants in this action.

The submitted Incident Report provides details of the Nov. 9 search, as well as facts leading to the incident, stating:

> On November 7, 2016, the Southern CERT members entered B-Dormitory and ordered all inmates to remove sticks and tied up blankets from their beds. The inmates refused to comply and became very hostile and aggressive toward the CERT members. The inmates gathered in a threatening and intimidating manner around the CERT members stating, "This is 2016, and we run this, slavery is over with, we already done killed one of y'all." Several unidentified inmates were observed with handmade knives in their possession. The CERT members were able to exit the dormitory without incident. The inmates with handmade knives were later identified by the CERT members through IMAS. On November 9, 2016, at approximately 6:35 a.m., the North Central, South Central, and Southern Team CERT Teams entered B-Dormitory to arrest the suspects. . . . All inmates were given orders to report to their assigned beds, lie down, and place their hands behind their back. The following inmates failed to comply with the orders given: . . . Brandon Washington B/283165 . . . . The CERT Team used force to include impact weapons and physical force on the above mentioned inmates to get them to comply with the orders given . . . . The inmates were arrested and escorted to the health care unit for medical assessments. . . .

(Doc. 26-17 at 2-3). The CERT Team's Nov. 9 search resulted in the confiscation of thirty (30) handmade knives and eleven (11) inmates were charged with failure to obey a direct order of an ADOC employee and allowed to remain in population pending the disciplinary action, while twenty-one (21) inmates, including Brandon Washington, were transferred to segregation pending disciplinary actions for failing to obey a direct order, gathering in a threatening or intimidating manner, and unauthorized possession of a weapon or device that could be used as a weapon (as these inmates were identified as participants in the Nov. 7 incident). (Id. at 3).

The Use of Force Investigative Report found that the CERT team members entered B-Dorm on Nov. 9 with "full tactical gear and riot shields in hand while armed with intermediate non/Lethal impact weapons such as: MK-37 rifles, 12 gauge bean bag round

shotguns and 37 mm lethal weapons." (Doc. 26-18 at 2). None of these weapons, however, were used on "aggressive" inmates. (Id.). The investigation revealed that "combative" inmates were "apprehended by utilizing empty hand techniques by way of two-on-one takedowns, and non-lethal force by way of baton and performing different angle thrust with the tip of the batons. Baton strikes were angled towards the chest and back areas of the aggressive and combative subjects." (Id.). The investigator concluded (after reviewing the techniques used to the inmates' injuries listed on the body charts) that the use of force was "minimal, "justified", "reasonable", and "necessary to gain compliance with the noncompliant inmates."[7] (Id.).

In denying allegations that Washington received inadequate medical treatment, Defendant Nurses Ashley Wall and Johnathan Langford ("Wall" and "Langford", respectively, and together "medical defendants") have submitted a copy of Washington's medical records (and further contend Washington's claims should be dismissed for failure to exhaust available administrative remedies). The medical records evidence that Washington was seen in the health care unit on Nov. 9 at 9:00 a.m. (Doc. 42-5 at 17). His vital signs were recorded (with his blood pressure at 115/90 and Pulse 110) and he

---

[7]  The investigating official determined:

> [T]here was evident proof of immediate threats to the safety of the officers, staff, inmates, and the institution based on the actively combative subjects who were apprehended. All forms of verbal de-escalation had failed; therefore, the level of resistance changed the level of force[] that was applied. The severity of the incident gains notice when considering the number of inmates who were actively involved and fully resistant with weapons in hand. The minimal amount of force was used to gain control of each subject involved in the incident.

(Doc. 26-18 at 2).

was assessed for injuries.  Washington's complaint at the time of the exam was, "Ribs sore". (Doc. 42-5 at 17).  The nurse's assessment detected a 2 cm abrasion in the left rib area, with no active bleeding, and the nurse concluded Washington was not in acute distress at that time. (Id.). Subsequently, on November 15, 2016, Washington submitted a sick call request, complaining of rib pain.  (Doc. 42-5 at 16).  He was examined that same day, with complaints of chest pain that rated a 10 out of 10 on a pain scale.  (Doc. 42-5 at 14).  HIs vital signs were recorded, with his blood pressure at 153/97 and his pulse at 103.  (Id.).  He reported that the pain was due to a recent trauma, which he described as "they beat my ass".  (Id.).  The record is void of any other requests for medical care or expressed symptoms or complaints related to the Nov. 9 incident or rib pain.

## II.  Summary Judgment Standard.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."); Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'") (emphasis omitted)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. See Anderson, 477 U.S. at 255.

ThyssenKrupp Steel USA, LLC v. United Forming, Inc., 926 F. Supp. 2d 1286, 1289-90 (S.D. Ala. Jan. 29, 2013) (citations omitted).

The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to material facts." Garczynski, 573 F.3d at 1165 (internal citations omitted). A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence in order to defeat a motion for summary judgment. *Id.* In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris,

9

550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007); see also Logan v. Smith, 439 F. App'x 798, 800 (11th Cir. Aug. 29, 2011) ("In cases where opposing parties tell different versions of the same events, one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations." (citations omitted) (unpublished)).

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)).  While there is no doubt that the defendants in this action were acting within their discretionary authority at all times when the acts in question occurred, the Eleventh Circuit has made clear that the defense of qualified immunity "is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court decisions in Hudson and Whitley." Skrtich v. Thornton, 280 F.3d 1295, 1301 (11th Cir. 2002) (citation omitted).  As to the remaining claims, officer defendants are entitled to qualified immunity unless Plaintiff can show that their conduct violated a clearly established statutory or constitutional right of which a reasonable person would have known.  See Belcher v. City of Foley, Ala., 30 F.3d 1390, 1395 (11th Cir. 1994).  Therefore, the Court will now address whether this action asserts any constitutional violation.

10

Plaintiff Washington has brought this action pursuant to 42 U.S.C. § 1983. "In order for a plaintiff to establish a claim under 42 U.S.C. § 1983, he must prove (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under the color of state law." Martinez v. Burns, 459 F. App'x 849, 850-851 (11th Cir. 2012) (citing *Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005)). There is no dispute that the named defendants, as employees of the Alabama Department of Corrections and its contracted medical provider, are state actors for purposes of this action. Thus, to establish his asserted claims, Washington must establish that the named defendants, personally, acted to deprive him of a constitutional right. Washington alleges that Nurses Wall and Langford denied him medical care and provided inadequate treatment in violation of the Eighth Amendment.

The Eighth Amendment prohibits indifference to a convicted prisoner's serious medical needs so deliberate that it "constitutes the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). "To prevail on a claim of deliberate indifference, a plaintiff must show: (1) a serious medical need; (2) defendant's deliberate indifference to that need; and (3) causation between the defendant's indifference and the plaintiff's injury." McDaniels v. Lee, 405 F. App'x 456, 458 (11th Cir. 2010) (citing Mann v. TaserInt'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009)). To satisfy the first objective element, Washington must prove his condition was, in fact, a serious medical need. "A 'serious medical need' is one that is diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment." Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1317 (11th Cir. 2010) (internal quotations omitted). "To satisfy the subjective element of

11

[a] deliberate indifference [claim, a] . . . Plaintiff must prove three subparts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005) (internal quotations omitted) (noting that subjective knowledge requires that defendant "'must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* [ ] must also draw the inference'") (quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811, (1994)); see also Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010).

Plaintiff alleges generally that Nurses Wall and Langford failed to provide him medical care following the Nov. 9 incident, including a body chart. Specifically, Washington claims:

> Then one by one we were taken to the infirmary where the nurse looked at my face asked for my name and sent me back. . . .For 2 months I dealt with extreme pain primary in my ribs which made every breath excruciating!! No medical treatment was given nor did a nurse do a body chart prior to me coming back here.

(Doc. 1 at 9).

Turning to the record, it evidences that Plaintiff received an examination and body chart on Nov. 9 at approximately 9:00 a.m. While Plaintiff's "selfies", taken on his cell phone, depict further bruising than is noted on the body chart, Plaintiff does not dispute the findings and observations indicated by the report. Accordingly, the record confirms Plaintiff had a slightly raised pulse, with normal blood pressure, and an abrasion to his left rib area. (Doc. 42-5 at 17). There was no active bleeding from the abrasion and Plaintiff was in no acute distress at that time. Consequently, Plaintiff cannot show that he was denied medical care or that a serious medical need was ignored on Nov. 9. At most,

Plaintiff's facts establish negligence, not deliberate indifference. See Wilson v. Seiter, 501 U.S. 294, 305, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (mere negligence does not satisfy the deliberate indifference standard). Deliberate indifference requires more than a showing of negligence or medical malpractice, and a misdiagnosis will not suffice. McElligott v. Foley, 182 F.3d 1248, 1256 (11th Cir. 1999) (holding that although "failure to diagnose can be deemed extremely negligent, it does not cross the line to deliberate indifference."). Deliberate indifference is also not established where an inmate receives care but desired different modes of treatment. Hamm v. DeKalb Cnty., 774 F.2d 1567, 1575 (11th Cir. 1985). There is simply no evidence that the medical staff's notation but nontreatment of a superficial abrasion to the ribs, that was not actively bleeding, was an objectively unreasonable response to Plaintiff's complaint of sore ribs. Furthermore, the record is void of evidence that the defendants acted with an attitude of deliberate indifference to Plaintiff's condition; thus he has failed to meet the subjective criteria of a valid § 1983 claim. Estelle, 429 U.S. at 107 ("A medical decision not to order an Xray, or like measures, does not represent cruel and unusual punishment."). Accordingly, Plaintiff's claim for denial of medical care against Wall and Langfor fails, as it relates to medical treatment directly following the Nov. 9 CERT team restrain of inmates.

Following the Nov. 9 incident, Plaintiff was placed in the segregation unit, where the nursing staff routinely made daily rounds to check on inmates.[8] The daily checks include visual assessments of the inmates' conditions and the administration of

---

[8] The record evidences what appears to be an Initial Health Review Form completed prior to Washington's placement in segregation. (Doc. 42-5 at 3). It reflects identical vital sign readings as Plaintiff's body chart, the same evaluation time as the body chart, the same assessment as the body chart, and is executed by the same nurse as the body chart. (Compare 42-5 at 17 to 42-5 at 3).

prescription medications. During these rounds, inmates are allowed to voice requests for medical care, but Plaintiff never did. (Doc. 42 at 9). The only complaint Plaintiff made related to injuries from the Nov. 9 incident was a single sick call request filed on November 15, 2016. (Doc. 42-5 at 16). The submitted November 15, 2016 request complained of "rib pain". (Id.). Plaintiff was examined the same day and complained to the evaluating nurse of "chest pain". (Doc. 42-5 at 14). The medical records evidence that Plaintiff exhibited normal respiratory and lung sounds, with no shortness of breath (doc. 42-5 at 14), and the on-call physician was contacted regarding Plaintiff's reported chest pain. (Doc. 42-5 at 15). It appears that an EKG was performed (the findings of which were normal) and that Plaintiff submitted no other sick call request, complaints or grievances in relation to rib pain, chest pain, or the Nov. 9 incident thereafter. (Doc. 26-21 at 26).

According to Plaintiff's complaint, only Nurses Wall and Langford have been named as medical defendants in this action. Notably, Plaintiff's pleadings are void of any specific allegations which Nurses Wall or Langford did or failed to do which caused Plaintiff any injury. The record is void of any evidence that Langford ever provided medical care to Washington, was requested to provided medical care to Washington, observed a need for medical care of Washington, or denied medical care to Washington. (Doc. 42-2). Additionally, no specific allegations have been asserted against Wall. Wall avers after Nov. 9 she saw Washington on approximately three occasions during the course of completing nursing rounds through the segregation unit. During those rounds, Washington did not voice any complaint to her or request additional medical care. (Doc. 42-3). Plaintiff does not dispute the version of facts put forth by the medical defendants.

There is no evidence of record to suggest that Plaintiff ever complained to Wall or Langford of needing medical treatment that was denied.

Also, to prevail on a claim of deliberate indifference, a plaintiff must show that deliberate indifference to a serious medical need caused the plaintiff's injury. See McDaniels v. Lee, 405 F. App'x 456, 458 (11th Cir. 2010) (citing Mann v .Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2010)). Additionally, Plaintiff has failed to provide any allegation or evidence that the denial or delay in medical treatment worsened his condition or caused him any actual harm. Hill v. Dekalb Reg. Youth Det. Ctr., 40 F.3d 1176, 1188-89 (11th Cir. 1994), *overruled in part on other grounds by* Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) (To succeed in proving that a delay in medical treatment rose to a constitutional violation, the plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. . . . Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.").(internal citations omitted).

Accordingly, Plaintiff has failed to establish a constitutional violation for denial of medical care against Wall and Langford. His allegations of failure to receive a body chart or receipt of an incomplete body chart and examination reflect negligence at best, and he has failed to sufficiently allege or show that, following his receipt of a body chart, Wall or Langford had subjective knowledge of a serious medical need. Additionally, the record belies Plaintiff's claim entirely that Nurses Wall and Langford were deliberately indifferent to his medical needs and/or failed to provide him medical care. Consequently, summary

15

judgment is **GRANTED** in favor of **Defendants Wall and Langford** on the claims asserted against them.

### VI. Conclusion.

As to Plaintiff's Eighth Amendment violation for denial of medical care, summary judgment is **GRANTED** in favor of all Wall and Langford.

**DONE** this the 4th day of February 2020.

                             *s/ Kristi K. DuBose*
                             **Kristi K. DuBose**
                             **CHIEF UNITED STATES DISTRICT JUDGE**